**THE RUSSELL NO. 17.**

No. 16871.

District Court, E. D. New York.

Jan. 12, 1944.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for libellant.

Alexander & Ash, of New York City, for claimant.

GALSTON, District Judge.

The Maryland is a coastwise wooden barge without motive power of her own, 235 feet long, 40 feet in width. On July 7, 1943, while she was lying at anchor in the North River in the vicinity of the Edgewater coal piers, she was taken in tow by the tug Russell No. 17. The port side of the Maryland was tied up along the starboard side of the Russell. The sterns of the vessels were about on the same line, and the bow of the Maryland extended a considerable distance ahead of the tug. The barge was light and had a free board of about 22 feet in that condition, drawing about 7 feet, 6 inches of water. The tow proceeded from the anchorage, which was north of the coal pier, to the south side of the coal pier in order to be within working distance of the loading apparatus on the coal pier. The approach to the dock on the south side was at an angle and a bow line was put out from the barge to the dock and made fast on the dock, inshore of the loading apparatus. At that time the stem of the Maryland was about 25 or 30 feet from the dock, with the mooring line made fast on the bitt of the Maryland. When the line came tight the tug maneuvered the barge into the dock, and when it slacked somewhat the captain of the barge removed the line from the bitt to the capstan, to take up the slack of the line. According to the bargee the tug pushed the stem of the Maryland into the dock; then the tug backed away and after various maneuvers brought the stem of the barge in contact with the dock a second time. These two contacts of the stem of the barge with the dock so damaged the barge that it was not possible to

load the boat with coal and the following morning it was taken to the shipyards for repairs.

The bargee testified he had not used steam to turn the capstan until after the second contact, but admitted that it was his practice to use the steam winch without orders from a tugboat captain whenever it was necessary to take up slack in the line.

The master of the Russell explained that he had first stationed his deckhand on the Maryland and then on the Russell so as to guide the Russell to the dock by giving ahead or backing signals. After the line had been passed from the barge to the dock, the deckhand returned to the tug, and at that time the strap line and the stern line between the two vessels were let go and the bow line from the tug was carried off to the stern quarter of the barge. The slack tide apparently had no effect on the navigation. There is some question about the effect of the north-east wind. The tug captain said it was without effect on the tow. The critical question in the case is the time of the operation of the steam winch. The captain at no time ordered the steam winch to be operated. His story is that steam on the side of the barge was observable and that the captain of the barge was pulling the bow of the barge to the dock. The tug captain, of course, could not tell from his position on the tug how far away the bow of the barge was from the dock at the time he first observed the steam coming from the winch. He did hear whistles blown from the dock which were signals to him to go back. He says he could not accomplish that movement because the tug was held back on the stern corner of the barge, ready to shove the barge into the dock. So far as his personal observation was concerned, the captain was unable to say whether there was any contact of the barge with the dock, nor could he tell the distance of the bow of the barge from the dock. The sides of the barge were much higher than the tug and were between him and the dock. The tug's deckhand was also uncertain about the distance of the stem from the dock at the time the line was thrown from the Maryland to the dock, saying that it was "anywhere from two to ten feet". He agrees with the captain of the barge in saying that the bow line was at first secured to the main bitt of the barge. Then he returned to the tug, but before doing so directed the barge captain not to use the steam winch and to leave the line alone. The deckhand had been ordered by the tug's captain to relay that instruction to the captain of the barge. After the bow line was made fast the deckhand let go the strap and the stern lines between the tug and the Maryland and the bow line from the tug was carried back to the stern quarter of the Maryland. The deckhand also noticed steam coming out of the port bow of the Maryland. At that time the tug's engines were not working and she was dead in the water. The deckhand confirmed the testimony of the tug's captain in respect to the signals from the dock and the inability of the tug to go back. He added: "We proceeded to land the barge;" and the captain of the barge called out that there had been damage at the stem. The deckhand did not see the contact nor feel the blow.

To ascribe fault in the light of the somewhat contradictory testimony given, due heed should attach to the testimony of Mansfield, the disinterested witness, for it is not possible to reconcile his version of the happening of the accident with that given by Foster, the barge's captain. The libellant would seek to ascribe the happening of the accident to faulty maneuvering by the tug in the light of existing wind conditions. Though it is true that a strong north-east wind would have a tendency to affect the starboard side of the barge and thus lead to increased effort on the part of the tug, it is more likely that the contact with the tug resulted from the use of the steam winch by the bargee. The tow was in charge of the captain of the tug and unsolicited assistance by the bargee was not calculated to help the mooring of the vessel. Moreover, if the testimony of the deckhand is to be credited, and I see no reason why it should not, the bargee was instructed not to use his steam winch. In any event, whether the deckhand so directed Foster is not determinative of whether in point of fact Foster did use the steam winch. It was Mansfield who saw the steam before contact with the dock and before he gave his whistle signals to the tug to back away. The narrow issue is whether the tug pushed the Maryland against the pier, or whether the barge captain, by the use of the barge's capstan, pulled the barge forcefully into the pier.

Accepting the testimony of Mansfield, on balance the latter version must be the finding.

Accordingly the libel will be dismissed. Appropriate findings of fact and conclusions of law will be filed concurrently herewith.